**In re Robert & Rebecca KEMPER, Debtors.**

**Bob Anderson, Chapter 7 Trustee, Plaintiff,**

**v.**

**Suresh Chainani and Dr. John Crabill, Defendants.**

**Bankruptcy No. 99–60800.**

**Adversary No. 99–6079.**

United States Bankruptcy Court, E.D. Texas, Tyler Division.

June 12, 2001.

---

Bob Anderson, Smead, Anderson & Dunn, Longview, TX, for Plaintiff, Bob Anderson, Chapter 7 Trustee.

Anthony A. Petrocchi, Weil & Petrocchi, Dallas, TX, for Defendants, Suresh Chainani & Dr. John Crabill.

## MEMORANDUM OF DECISION RE-GARDING COMPETING MOTIONS FOR SUMMARY JUDGMENT

BILL G. PARKER, Bankruptcy Judge.

Now before the Court in the above-referenced adversary proceeding are competing motions for summary judgment: a Motion for Partial Summary Judgment filed by the Plaintiff, Bob Anderson, the Chapter 7 Trustee (the "Trustee") and two motions for summary judgment filed by the Defendants, Suresh Chainani and Dr. John Crabill (the "Defendants"). Though it is not mandated under the Federal Rules of Bankruptcy Procedure, this memorandum of decision is entered for the benefit of the parties' preparation for trial and disposes of all issues currently pending before the Court.[1]

### Factual and Procedural Background

On July 14, 1998, following negotiations conducted in Florida, Suresh Chainani agreed to loan the sum of $125,000.00 to Robert Kemper (the "Debtor"). To evidence that indebtedness, the parties agreed that the Debtor would execute a promissory note payable to Mr. Chainani (the "Chainani note"). The Chainani note provided for a maturity date of September 15, 1998 at which time the Debtor would be required to repay the principal amount, plus a "one time interest payment" of an additional $125,000.00. The Chainani note was prepared and executed by the Debtor in Texas and faxed to Mr. Chainani in Florida on the same day. It expressly provided that it was "to be construed and enforced according to the laws of the State of Texas." After his receipt of the Chainani note, Mr. Chainani funded the loan by drawing a check on his bank account in Florida, and sending the check to the Debtor in Texas.

On July 24, 1998, the Debtor, both individually and as President of Hospitality Purchasing Services, Inc,.[2] executed a promissory note payable to Dr. John Crabill (the "Crabill note") in the amount of $135,000.00. The Crabill note also provided for a maturity date of September 15, 1998 and that the Debtor, in addition to the repayment of the principal loan amount, would also make on that maturity date a "one time interest payment" of $190,000.00 to Dr. Crabill. The Crabill note also would "be construed and enforced according to the laws of the State of Texas," Upon delivery of the promissory note from the Debtor, Dr. Crabill funded the loan by drawing a check on his bank account in Florida, and sending the check to Hospitality Purchasing Services, Inc. at its offices in Georgia.

When the Chainani and Crabill notes respectively matured on September 15, 1998, the Debtor was not able to pay the principal or the interest on either note. Thereafter, on September 21, 1998, both notes were renewed. The Chainani note was renewed for four (4) months and, un-

---

**1.** This Court has jurisdiction to consider these motions pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This Court possesses the authority to consider these motions for summary judgment pursuant to 28 U.S.C. § 157(c)(1) and to enter final orders in this proceeding pursuant to the consent of the parties under 28 U.S.C. § 157(c)(2).

**2.** Hospitality Purchasing Services, Inc. is a Georgia corporation doing business in Georgia.

der its terms, the Debtor was required to make monthly interest payments of $2,084.00 and, upon its maturity, repay the $125,000.00 principal together with a $125,000.00 "consulting fee." Likewise, the Crabill note was renewed for a term of four (4) months. Under the terms of the renewed Crabill note, the Debtor would make monthly interest payments of $2,250.00 and, upon maturity of the note, repay the $135,000.00 principal along with a $190,000.00 "consulting fee." Both renewal notes were drafted and executed by the Debtor in Texas and faxed to the respective Defendants in Florida. Each renewal note again expressly provided that it would be construed and enforced pursuant to Texas law. Upon the renewal of the Crabill note, Dr. Crabill assigned his interest in the note to Mr. Chainani with recourse.

Though the Debtor tendered one interest payment to each payee on the date the notes were renewed, he subsequently failed to make any further payments under either note. As a result, on March 2, 1999, the Defendants, through their attorney, sent two letters to the Debtor demanding payment on each of the respective renewal notes. Specifically, the letters demanded payment of $131,252.00 on the renewed Chainani note, and $141,750.00 on the renewed Crabill note. Neither letter demanded payment of, nor even mentioned, the "consulting fees."

On April 13, 1999, without making any further payments on the renewal notes, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Bob Anderson was appointed as the Chapter 7 Trustee of the Debtor's bankruptcy estate. On July 27, 1999, the Trustee sent a letter to Mr. Chainani's attorney and to Dr. Crabill (the "usury violation notice") in which he claimed that the respective renewal notes provided for the payment of an in-

terest rate above the maximum amount allowed under Texas law. The Defendants did not respond to the Trustee's letter.

On September 30, 1999, the Trustee sent a second letter to Mr. Chainani's attorney and to Dr. Crabill. This second letter, based upon the Defendants' total failure to respond to the Trustee's first letter, demanded the payment of damages in the amount of $237,508.00 on the renewed Chainani note, and $413,400.00 on the renewed Crabill note based upon the asserted violations of the Texas usury statutes.

The Defendants' attorney responded to the Trustee's second letter on October 15, 1999. In his response, the Defendants' attorney stated that the Trustee's interest calculations were incorrect because the "consulting fees" were erroneously characterized as interest when they were not. The response further claimed that any violation of the Texas usury statutes were corrected by the March 2, 1999 demand letters, as allowed under Texas Finance Code § 305.103 and that, therefore, the Defendants were not liable for any damages.

On December 20, 1999, the Trustee filed the complaint in this adversary proceeding in which he prays for damages arising from the Defendants' violations of the Texas usury statutes. The Trustee asserts that each note contracts for a rate of interest in excess of thirty (30) times that permitted under Texas law. The Defendants denied all of the Trustee's allegations in their answer to the complaint and also asserted several affirmative defenses.

Shortly after the Defendants filed their answer, the Trustee filed a motion for partial summary judgment. In his motion, the Trustee argues that there are no disputed issues of material fact and that he is entitled to judgment as a matter of law that: (1) the Defendants contracted for a usurious amount of interest in the renewal

notes; (2) the Trustee's calculation of damages under the Texas usury statute is correct; and (3) correspondence sent by the Defendants on March 2, 1999 and October 15, 1999, respectively, do not constitute valid corrections of a usury violation under Texas law. In response, the Defendants assert that there exists a genuine issue of material fact as to whether or not the "consulting fees" are actually disguised interest which precludes any summary judgment in favor of the Trustee.[3]

Actually prior to the filing of their response to the Trustee's motion, the Defendants filed their own motion for summary judgment, asserting that, as a matter of law, the March 2, 1999 demand letters constituted valid corrections of any usury violation under Texas law. Alternatively, the Defendants assert that the passage of the bar date for claims without a claim having been asserted by either Defendant impliedly constitutes a response to the Trustee's usury violation notice. The Defendants further assert that, because the Debtor's bankruptcy filing imposed the automatic stay, they were precluded from responding to the Trustee's violation notice and thus, they assert that the provisions of § 108(c) of the Bankruptcy Code should apply to toll the time period for any response to the Trustee's usury violation notice. The Trustee, of course, asserts that the March letters do not legally constitute a valid correction, and that the other arguments fail to excuse the Defendants' purported failure to respond to his usury violation notice.

The Defendants subsequently filed an amended answer and a "Second Motion for Summary Judgment" in which they assert, for the first time, that Texas law is not applicable to this dispute. Instead, the Defendants claim that, notwithstanding the express provisions in the renewal notes which adopt Texas law as the governing law of construction, either the law of Florida or the law of Nevada should properly be applicable to this dispute as the one with the most reasonable relationship to the transactions. The Trustee responded that, in a proper choice of law analysis, Texas law governs this dispute.

### Discussion

#### Standard for Summary Judgment

The parties bring their respective Motions for Summary Judgment in this adversary proceeding pursuant to Fed. R. Bankr.P. 7056. That rule incorporates Fed.R.Civ.P. 56 which provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), *quoting* Fed.R.Civ.P. 56(c). If a summary judgment motion is properly supported, a party opposing the motion may not merely rest upon the contents of its pleadings, but rather must demonstrate in specific responsive pleadings the existence of specific facts constituting a genuine issue of material fact for which a trial is necessary. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), *citing* Fed.R.Civ.P.

---

3. See the second affidavit of Suresh Chainani in which he claims that the "consulting fees" were related to an agreement of the Debtor to pay the Defendants for their work in finding investors for a corporation with which the Debtor was involved. This statement is contradicted by the affidavit of the Debtor in which he stated that no consulting services were performed by the Defendants.

56(e). The substantive law will identify which facts are material. *Id.*

The non-movant must show more than a "mere disagreement" between the parties, *Calpetco 1981 v. Marshall Exploration, Inc.,* 989 F.2d 1408, 1413 (5th Cir.1993), or that there is merely "some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, "[t]he issue of material fact which must be present in order to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson,* 477 U.S. at 248–249, 106 S.Ct. at 2510.

The record presented is reviewed in the light most favorable to the non-moving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356, *citing First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). Further, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

### Choice of Law

■ The first step toward the resolution of the dispute between these parties is to determine whether these transactions should be governed by the laws of Texas, Florida or Nevada. In making this choice of law, a federal court customarily applies the choice of law principles of the state in which it sits. *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Thus, Texas choice of law rules will be utilized in order to determine the correct substantive law to apply to these transactions. *See Woods–Tucker Leasing Corporation of Georgia v. Hutcheson–Ingram Development Company,* 642 F.2d 744 (5th Cir.1981).

Initially this Court must determine if the choice of law provisions contained in the two promissory notes should be given effect. "Texas courts evaluate choice of law provisions by two separate standards, one for transactions governed by the Uniform Commercial Code and the other for transactions governed by Texas common law." *Admiral Insurance Company v. Brinkcraft Development, Ltd.,* 921 F.2d 591, 592 (5th Cir.1991). *See also, Davidson Oil Country Supply, Inc. v. Klockner, Inc.,* 908 F.2d 1238, 1248 (5th Cir.1990)["Because the UCC governs this case, the choice of law provisions contained in that Code must be applied."]; *Jett Racing & Sales, Inc. v. Transamerica Commercial Finance Corp.,* 892 F.Supp. 161, 162 (S.D.Tex.1995). By utilizing the UCC choice of law provisions for transactions otherwise governed by it, Texas "seeks to balance the policy of national commercial uniformity embodied in the UCC against the parochial self-defense embodied in the state usury laws." *Id.* at 594. This case is based upon the construction of promissory notes which clearly qualify as negotiable instruments under § 3.104(a) of the Texas version of the Uniform Commercial Code.[4]

---

4. UCC § 3.104(a) provides, in relevant part, that:

Except as provided in Subsections (c) and (d), "negotiable instrument" means an unconditional promise or order to pay a fixed

Therefore, the choice of law rules derived from the Uniform Commercial Code are properly applicable to the consideration of these transactions.[5]

■ TEX. BUS. & COM.CODE § 1.105(a) provides, in relevant part, that:

 ... when a transaction bears a reasonable relationship to this state and also to another state or nation the parties may agree that the law of either of this state or of such other state or nation shall govern their rights and duties.... [6]

This statute seeks to support the concept known as "party autonomy" under which courts defer to the choice of law adopted by contracting parties, unless the chosen law has no relation to the parties or the agreement, or the choice of law made by the parties would offend the public policy of the state whose laws ought otherwise to apply. *Salazar v. Coastal Corp.*, 928 S.W.2d 162 (Tex.App.—Houston [14th Dist.] 1996, no writ).

In their second motion for summary judgment which dealt with this issue, the Defendants presented no argument that the transaction bore no reasonable relation to Texas. Nor did they demonstrate that the reference to Texas law in the notes was in some way an improper attempt to avoid the application of Florida or Nevada law. Rather the Defendants argue that Florida and Nevada enjoy more significant contacts with the transactions at issue than does Texas.

■ However, pursuant to the choice of law analysis under the Uniform Commercial Code, a court need not conduct a comparison of the significance of each state's contacts in order to validate a choice of law provision selected by the parties. Instead, one need only determine if there are sufficient contacts to create a reasonable relationship between the transaction and the state *actually chosen* by the parties, and, if so, whether the parties contrived those contacts through some means in order to avoid application of another state's law. *Woods–Tucker*, 642 F.2d at 749–50.

■ The contacts in this case are more than sufficient to establish a reasonable relationship between the state of Texas and the transactions at issue in this case.

---

amount of money, with or without interest or other charges described in the promise or order, if it:

(1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

(2) is payable on demand or at a definite time; and

(3) does not state any other undertaking or instruction by the person promising or order payment to do any act in addition to payment of money, but the promise or order may contain:

(A) an undertaking or power to give, maintain, or protect collateral to secure payment;

(B) an authorization or power to the holder to confess judgment or realize on or dispose of collateral; or

(C) a waiver of the benefit of any law intended for the advantage or protection of an obligor.

TEX. BUS. & COMM.CODE ANN. § 3.104(a)(Vernon Supp.2001). The exceptions contained in § 3.104(c) and (d) are inapplicable to this case.

5. Since we are dealing in this case with promissory notes that are properly governed by the Uniform Commercial Code, the "most significant relationship" test derived from the Restatement (Second) of Conflict of Laws § 187 and adopted by the Supreme Court of Texas in *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670 (Tex.1990), *cert denied*, 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991), is not applicable to the determination in this case.

6. TEX. BUS. & COM.CODE ANN. § 1.105(a) (Vernon Supp.2001).

The Debtor was domiciled in Texas at the time he executed the notes. The renewal notes were prepared in Texas, executed in Texas, and mailed from Texas. The only payments on these notes were generated solely by actions taken by the Debtor in Texas. Checks were drawn upon a Tyler, Texas bank and the Debtor mailed those payments from Texas. Thus, the parties' election to apply Texas law to these transactions must be upheld unless it can be shown that such contacts were concocted by the parties for the purpose of avoiding the application of another state's law.

However, there is no evidence that these contacts were contrived in order to avoid the application of Nevada or Florida law. In *Woods–Tucker*, the Fifth Circuit found as a matter of law that "a party's choice of law in a multi-state UCC transaction cannot be regarded as a contrivance to evade the usury law ... when the transaction bears a reasonable relation to the state whose law is chosen to govern the transaction." *Woods–Tucker*, 642 F.2d at 751; *See also Admiral Insurance*, 921 F.2d at 593. Accordingly, the parties' selection of Texas law to govern the interpretation and enforcement of these loan obligations shall be recognized and upheld by this Court.

*Texas Usury Law*

■■■ The Trustee complains that the Defendants contracted in the referenced promissory notes to receive from the Debtor an interest rate in excess of the maximum amount permitted under Tex.Rev.Civ. Stat. art. 5069 [7] and that, accordingly, the Defendants are liable to the bankruptcy estate for usury damages. Contracting for, charging, or receiving interest greater than the maximum amount allowed by law constitutes usury. *Pentico v. Mad–Wayler, Inc.*, 964 S.W.2d 708, 714 (Tex.App.—Corpus Christi 1998, pet. denied).[8] Usury statutes are designed to penalize those who intentionally charge for interest which exceeds that permitted by law. However, it is recognized that usury statutes are penal in nature and must be strictly construed. *Steves Sash & Door Co., Inc. v. Ceco Corp.*, 751 S.W.2d 473, 476 (Tex. 1988).

Art. XVI, section 11 of the Texas Constitution grants authority to the Texas Legislature to establish maximum rates of interest to be charged in various types of transactions.[9] The Legislature has exer-

---

7. Though Texas has had various usury statutes in its history, the genesis of the current usury provisions can be traced back to 1967 when Article 5069 was adopted into the Texas Credit Code. It expanded the scope of usury protection and for the first time provided a set of statutory penalties for violations of the interest rate ceilings. Note, "Recent Changes in the Texas Usury Statutes—Do They Affect Common Law Usury Claims?", 3 Tex. Wesleyan. L.Rev. 421, 427 (Spring?1997). Article 5069 was codified into Chapter 301 et seq. of the Texas Finance Code as of September 1, 1997. No substantive change in the law was intended by the codification. Tex. Fin.Code Ann. § 1.001(a); *Pegasus Energy Group, Inc. v. Cheyenne Petroleum Company*, 3 S.W.3d 112, 124, n. 11 (Tex.App.—Corpus Christi 1999, pet. denied 2000). The Court will henceforth in this memorandum simply refer to the applicable section of the Texas Finance Code.

8. Texas law defines interest as "the compensation allowed by law for the use or forbearance or detention of money." Tex. Fin.Code Ann. § 301.002(a)(4) (Vernon Supp.2001).

9. Tex. Const. Art. XVI, sec. 11 provides, in relevant part, that:

The Legislature shall have authority to classify loans and lenders, license and regulate lenders, define interest and fix maximum rates of interest; provided, however, in the absence of legislation fixing maximum rates of interest all contracts for a greater rate of interest than ten per centum (10%) per annum shall be deemed usurious; provided, further, that in contracts where no rate of interest is agreed upon, the rate shall not exceed six per centum (6%) per annum.

cised that authority through what is now codified in Texas Finance Code § 302.001, which declares that all contracts for usurious interest "are contrary to public policy and subject to the appropriate penalty prescribed by Chapter 305"[10] and that statute prescribes a maximum interest rate of 10 percent a year "except as otherwise prescribed by law."

Interest rate ceilings in excess of 10% per year are, in fact, established in Chapter 303 of the Texas Finance Code. The ceilings are based upon a calculation of a "weekly ceiling" by the Texas consumer credit commissioner.[11] For most transactions, § 303.009 imposes a ceiling of 18% a year, unless the actual computed figure exceeds 18%, at which time the ceiling rises to 24% per year.[12]

A plaintiff is entitled to a judgment for a usury violation under Texas law by establishing three elements: (1) a loan of money from a creditor to an obligor; (2) an absolute obligation of the obligor to repay the principal of the loan; and (3) the exaction by the creditor of a greater compensation than allowed by law for the use of the money by the obligor. *First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex.1994); *C.C. Port, Ltd. v. Davis–Penn Mortgage Company*, 61 F.3d 288 (5th Cir.1995). If established, Texas law provides that:

> A creditor who contracts for, charges, or receives interest that is greater than the amount authorized ... is liable to the obligor for an amount that is equal to the greater of:
>
> (1) three times the amount computed by subtracting the amount of interest allowed by law from the total amount of interest contracted for, charged, or received; or
>
> (2) $2,000 or 20 percent of the amount of the principal, whichever is less.[13]

Such a creditor will also be liable for an award of reasonable attorney's fees[14] and, if the creditor has charged *and received* interest greater than twice the amount authorized, additional liability will be imposed for an amount equivalent to the principal and interest which the obligor has paid under the contract.[15]

---

**10.** Tex. Fin.Code Ann. § 302.001(b)(Vernon Supp.2001). However, that statement is not accurate, for if the contract is of a specialized type (addressed under Chapters 342, 345, 346, 347, or 348) which permits higher rates of interest and greater charges than those which are otherwise allowed by law, and which can only be offered by a bank, a savings association, or by a person who is licensed to engage in such business, then the assessment of penalties for a usury violation under such a contract is governed by the provisions of Chapter 349 of the Texas Finance Code, not by Chapter 305. Tex. Fin. Code Ann § 303.402 (Vernon Supp.2001).

**11.** The Texas Finance Code provides that the weekly ceiling is computed by multiplying by two the auction average rate quoted on a bank discount basis for 26–week treasury bills issued by the United States government for the week preceding the week in which the rate ceiling is to take effect; and then round-ing the obtained result to the nearest one-quarter of one percent. Tex. Fin.Code Ann. 303.003 (Vernon Supp.2001).

**12.** The 24% ceiling may be raised to 28% for contractual agreements for extensions of credit of at least $250,000.00 which are made for business, commercial, investment purposes, while the maximum rate for open-end credit agreements which do not impose merchant discounts can never rise above 21%. Tex. Fin.Code Ann. 303.009(c) and (d) (Vernon Supp.2001).

**13.** Tex. Fin.Code Ann. § 305.001(a) (Vernon Supp.2001).

**14.** Tex. Fin.Code Ann. § 305.005 (Vernon Supp.2001).

**15.** Tex Fin.Code Ann. § 305.002 (Vernon Supp.2001). Texas courts also traditionally allowed the recovery of common law usury

There is no dispute regarding the existence of the loans or the fact that the Debtor was contractually obligated to repay the principal of the loans. The Finance Code provides that a contract to renew or to extend the terms of payment of a debt is governed by the rate ceiling in effect at the time of the renewal or extension.[16] It is established that the published interest rate ceiling applicable to these transactions [for the period from September 21, 1998 through September 27, 1998] was 18% per year.[17] The issue for determination is whether all of the compensation required under the promissory notes to be paid by the Debtor was actually a charge for the use of the Defendants' money. Each side claims an entitlement to a summary judgment on the assertion that there is no genuine issue of material fact as to this third element of the Trustee's usury claim.

■■■■ However, the Court finds that neither side is entitled to a summary judgment on this critical element. Whether a fee contained in a contract constitutes disguised interest is almost inherently a question of fact, *Gonzales County Savings & Loan Association v. Freeman*, 534 S.W.2d 903, 906 (Tex.1976); *Dryden v. City National Bank of Laredo*, 666 S.W.2d 213 (Tex.Civ.App.—San Antonio 1984, writ ref'd n.r.e.), and that issue of fact remains in genuine dispute in this controversy. The respective affidavits of the parties could not be in greater conflict over whether the "consulting fees" referenced in the promissory notes are accurately characterized or whether they are, in fact, an interest component of the contract.

■■■■ That factual dispute alone precludes the entry of a summary judgment for either side, unless the Defendants can establish that they properly issued a correction of any potential usury violation arising under the transactions. The Defendants claim that, as a matter of law, either the March, 1999 demand letters to the Debtor or the October 15, 1999 letter to the Trustee met the requirements for correction under Texas law and thus, they are protected from any usury violations which might have otherwise arisen from either transaction.

The procedure under which lenders may avoid liability for a usurious transaction through the issuance of a correction letter is a relatively new concept in Texas and represents a dramatic shift from prior law. The first correction statute was adopted in

damages as a separate cause of action, *see,* e.g. *Duggan v. Marshall*, 7 S.W.3d 888, 892 (Tex.App.—Houston [1st Dist.] 1999, no writ), which observed that:

Although the legislature has "established a statutory scheme providing for the recovery of usurious interest contracted for, charged, or received, the legislature neither expressly declared nor necessarily implied an intention to abrogate the common-law remedy." The common-law action to recover usurious interest paid was established in Texas in *Bexar Building & Loan Association v. Robinson*, 78 Tex. 163, 14 S.W. 227 (1890). Repeal of the common-law action and remedy by implication is disfavored and requires a clear repugnance between the common-law and statutory causes of action. When the legislature creates a cause of action and a remedy for its enforcement, we regard that legislation as cumulative of the common-law cause of action and remedy, unless the statute expressly or impliedly negates the latter. Therefore, the statutory action for usury did not repeal the common-law action established in *Robinson*. (citations omitted).

Though it arguably is inapplicable to strip common-law rights existing under a 1998 agreement, the Texas legislature in 1999 expressly foreclosed the availability of separate common law recoveries for usury violations. *See* Tex. Fin.Code Ann. § 305.007.

16. Tex. Fin.Code Ann. § 303.013 (Vernon Supp.2001).

17. 23 Tex. Reg. 9845 (September 25, 1998).

1993 in a stated attempt to moderate the nature of Texas usury laws which were viewed by business interests as unusually harsh.[18]  As now codified in the Texas Finance Code, § 305.103(a) provides that:

A creditor is not liable to an obligor for a [usury] violation ... if:

(1) not later than the 60th day after the date the creditor actually discovered the violation, the creditor corrects the violation as to that obligor by taking any necessary action and making any necessary adjustment, including the payment of interest on a refund, if any, at the applicable rate provided for in the contract of the parties; and

(2) the creditor gives written notice to the obligor of the violation before the obligor gives written notice of the violation or files an action alleging the violation.

However, the Defendants have failed to establish compliance with the requirements for a valid usury violation correction under § 305.103. As an initial matter, the Defendants' summary judgment evidence fails to establish the date upon which the Defendants actually discovered the violation, which is critical to the determination as to whether the purported correction was timely proffered.  However, even if the purported correction was timely, both sets of correspondence still fail to meet the statutory standards for correction.

The Defendants' correspondence to the Debtor in March, 1999 were simple demand letters.  They demanded payment of the accrued principal amount, plus the amounts specifically characterized in the notes as interest.  There was no mention of the "consulting fees" which constitute the crux of the Trustee's cause of action in this case.  According to the Defendants,

the limited scope of these demands for payment is tantamount to a correction under § 305.103.

However, the restrictive scope of the Defendants' demands merely reflects at best compliance with a portion of the statutory requirements for correction under § 305.103. It is arguable as to whether the demands even fulfill the statutory obligation imposed upon the correcting creditor to take "any necessary action" and to make "any necessary adjustment" regarding the usurious contract.  These demands do not constitute a release of the Debtor's obligation regarding the consulting fees.  In fact, they do not address the consulting fees in any manner.  However, even if the omission of the consulting fees from the demands could be properly characterized as a fulfillment of the first requirement of an "action" or "adjustment," a correction is validly issued under § 305.103 only when that correcting action or adjustment is made *and* "the creditor gives written notice ... *of the violation* before the obligor [acts] ...." § 305.103(b)(emphasis added). Thus, a correction of a usury violation under § 305.103 must be just that—an acknowledgment of the existence of a usury violation accompanied by the adjustment or correction required in order to bring the transaction into compliance with the applicable usury standard.  The Defendants' transmission of a demand letter on March 2, 1999, which makes no acknowledgment of a usury violation and contains no reference at all to the specific provisions of the contract which arguably create that violation, does not constitute a valid correction of a usury violation under § 305.103.

However, even if a creditor never discovers nor acknowledges a usury violation, or otherwise fails to seize the opportunity

**18.**  Note, 3 Tex. Wesleyan. L.Rev. at 434, n.   112.

to issue a correction as set forth in § 305.103, a more recent amendment to Texas law offers an offending party yet another opportunity to escape liability for a usury violation by issuing a post-notice correction under the provisions of TEX. FIN. CODE § 305.006(c). That statute, adopted in 1999,[19] releases the offending party from the strict time requirements otherwise imposed by § 305.103(a) by providing that, after receipt of the mandatory written notice of the violation from the obligor as prescribed by § 305.006(b),

> A creditor who receives a notice [of a violation] may correct the violation as provided by Section 305.103 during the period beginning on the date the notice is received and ending on the 60th day after that date. A creditor who corrects a violation as provided by this section is not liable to an obligor for the violation.[20]

The Trustee issued to the Defendants his notice of the alleged usury violations on July 27, 1999. That notice met the requirements of § 305.006(b). During the sixty-day period following July 27, 1999, no response to that notice was issued by the Defendants. It was only following the Trustee's subsequent correspondence of September 30, 1999 that the Defendants responded on October 15, 1999, not with a valid correction encompassing an acknowledgment and adjustment of the violation as required under § 305.103, but rather containing: (1) the assertion that the Trustee was in error in alleging a usury violation at all; (2) a not so subtle threat that the Defendants might seek Rule 11 sanctions against the Trustee if he failed to reevaluate his position; and (3) an argument that the omission of the consulting fees from the March demand letters constituted a valid correction. While the transmittal of contentious arguments certainly demonstrates the existence of a genuine dispute among the parties, it fails to meet not only the letter, but the spirit, of the correction procedures. Thus, not only did the October 15th letter fail to meet the 60–day deadline established under § 305.006(c),[21] it failed to constitute a proper correction under the standards of § 305.103, which is a prerequisite to the receipt of liability protection offered by § 305.006(c). Accordingly, the Court concludes that the Defendants failed to capitalize upon their opportunity to absolve themselves from liability for any usury violation through the procedures offered under the Texas Finance Code. Their opportunity to demon-

---

**19.** Though the Trustee might legitimately argue that the Defendants may not properly be permitted to escape a usury violation through a statutory procedure which had not been enacted at the time of the transaction, the Court need not decide that issue since the Defendants failed to comply in any event with the terms of the new statute.

**20.** This may have been adopted in recognition of the fact that the § 305.103(a) correction procedure, when combined with the continued availability of a *common law* usury claim in Texas (to that date), created a "catch 22" for creditors that left them in a very precarious position. Because the notification required of a creditor in order to cure a discovered statutory usury claim would likely trigger knowledge of the existence of a

separate and distinct common law usury claim arising from the same transaction, the correction procedure could not provide the degree of protection sought by its adoption. *See supra*, note 15. However, the separate common law remedies are no longer available. See, TEX. FIN.CODE ANN. § 305.007 (Vernon Supp.2001).

**21.** The Defendants' argument that the 60–day deadline under § 305.006(c) was tolled pursuant to the provisions of 11 U.S.C. § 108(c) is without merit because the Defendants' time period to respond to the Trustee's demand was not a " . . . period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor."

strate that there was, in fact and in law, no usury violation arising from these transactions shall soon be provided. However, in the meantime, the Defendants' motions for summary judgment in this proceeding must be denied.

Conversely, the Trustee requests the entry of a partial summary judgment in his favor on the ground that, as a matter of law, the correspondence issued on the Defendants' behalf in March and October, 1999 do not constitute valid notices of correction of a usury violation.

A partial summary judgment may be granted in accordance with Fed.R.Civ.P. 56(d).[22] A partial summary judgment order

> ... is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case. Such an order is interlocutory in nature, is subject to revision ..., and has no res judicata effect.

*F.D.I.C. v. Massingill*, 24 F.3d 768, 774 (5th Cir.1994). "It simply empowers the court to withdraw some issues from the case and to specify those facts that really cannot be controverted." *Minnesota Corn Processors, Inc. v. American Sweeteners, Inc. (In re American Sweeteners, Inc.)*, 248 B.R. 271 (Bankr.E.D.Pa.2000) (citations omitted).

Based upon the earlier analysis that the Defendants failed to meet the statutory requirements for protection under §§ 305.103 and 305.006(c) of the Texas Finance Code, the Court finds that the Trustee is entitled to a partial summary judgment on the Defendants' affirmative defense that their March, 1999 demand letters to the Debtor or their October 15, 1999 letter to the Trustee met the requirements for the correction of a usury violation under Texas law. In all other respects, the Trustee's Motion for Partial Summary Judgment is denied. Appropriate orders will be entered consistent with this memorandum.

---

22. Fed.R.Civ.P. 56(d), as incorporated into bankruptcy adversary proceedings by Fed. R. Bankr.P. 7056, provides that:

Case Not Fully Adjudicated on Motion. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.