25 A.3d 110

**FORD MOTOR CREDIT COMPANY, LLC**

v.

**Maureen P. ROBERSON.**

**Misc. No. 15, Sept. Term, 2010.**

Court of Appeals of Maryland.

July 15, 2011.

Daniel C. Fleming (Wong Fleming, Princeton, New Jersey), on brief, for Appellant.

Scott C. Borison (Legg Law Firm, LLC, Frederick, MD), on brief, for Appellee.

Brett Weiss (Chung & Press, LLC, Greenbelt, MD; Andrew B. Wilson, II of Andrew G. Wilson, II, PC, Annapolis, MD), on brief, for Appellee.

Rebecca J. Coleman, Phillip R. Robinson, Anthony DePastina, Baltimore, MD, amici curiae for Civil Justice Inc., the Maryland Cash Campaign, the Public Justice Center, the Maryland Legal Aid Bureau, Inc., and the University of Maryland School of Law Consumer Protection Clinic.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and BARBERA, JJ.

BATTAGLIA, J.

We have before us a question of law certified by the United States Bankruptcy Court for the District of Maryland, pursuant to the Maryland Uniform Certification of Questions of Law Act, Maryland Code (1974, 2006 Repl.Vol.), Sections 12–601 *et seq.* of the Courts and Judicial Proceedings Article and Maryland Rule 8–305,[1] that being:

Whether the repossession of a vehicle based solely on the violation of an *ipso facto* clause of a vehicle retail installment contract, in the absence of any other breach, is permissible under Maryland law?

In the Certification Order, the bankruptcy judge summarized the circumstances giving rise to the question now before

1. Rule 8–305 states:

   (a) **Certifying court.** "Certifying court" as used in this Rule means a court authorized by Code, Courts Article, § 12–603 to certify a question of law to the Court of Appeals of Maryland.

   (b) **Certification order.** In disposing of an action pending before it, a certifying court, on motion of any party or on its own initiative, may submit to the Court of Appeals a question of law of this State, in accordance with the Maryland Uniform Certification of Questions of Law Act, by filing a certification order. The certification order shall be signed by a judge of the certifying court and state the question of law submitted, the relevant facts from which the question arises, and the party who shall be treated as the appellant in the certification procedure. The original order and seven copies shall be forwarded to the Court of Appeals by the clerk of the certifying court under its official seal, together with the filing fee for docketing regular appeals, payable to the Clerk of the Court of Appeals.

   (c) **Proceeding in the Court of Appeals.** The filing of the certification order in the Court of Appeals shall be the equivalent of the transmission of a record on appeal. The Court of Appeals may request, in addition, all or any part of the record before the certifying court. Upon request, the certifying court shall file the original or a copy of the parts of the record requested together with a certificate, under the official seal of the certifying court and signed by a judge or clerk of that court, stating that the materials submitted are all the parts of the record requested by the Court of Appeals.

   (d) **Decision by the Court of Appeals.** The written opinion of the Court of Appeals stating the law governing the question certified shall be sent by the Clerk of the Court of Appeals to the certifying court. The Clerk of the Court of Appeals shall certify, under seal of the Court, that the opinion is in response to the question of law of this State submitted by the certifying court.

us, involving an action by a debtor, Maureen Roberson, to recover damages because Ford Motor Credit Company had repossessed her car shortly after she was discharged in bankruptcy, even though she had made timely monthly payments on the vehicle indebtedness before, during, and after the bankruptcy proceedings, but failed to "reaffirm"[2] the debt:

The debtor in this case, Maureen Roberson (Ms. Roberson or the "Debtor") filed a petition under chapter 13[3] of title 11 of the United States Code (the "Bankruptcy Code") on February 21, 2008. According to Ms. Roberson, she filed her petition because Ford Motor Credit Company, LLC ("Ford") wrongfully repossessed her car in the wake of her prior chapter 7[4] bankruptcy discharge and she wanted to redress that wrong.

Ms. Roberson filed a previous chapter 7 bankruptcy case (bankruptcy case no. 07–20394) on October 22, 2007 and she received a discharge of her debts on January 30, 2008. On

---

**2.** A debtor in bankruptcy may reaffirm, or assume personal liability for, a debt by entering into a reaffirmation agreement, as follows:

A reaffirmation agreement, a term not actually used in the Bankruptcy Code itself, is an agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under the Bankruptcy Code. An enforceable reaffirmation agreement makes a debtor remain personally obligated after discharge for a debt which is otherwise dischargeable.

1B *Bankruptcy Service Lawyers Edition* § 10A:238 (Thomson Reuters 2010) (footnotes omitted).

**3.** Chapter 13 is described as a type of "reorganization" as follows:

Chapter 13 is a type of "reorganization" used by individuals to pay all or a portion of their debts over a period of years using their current income.

13 *Collier on Bankruptcy* § CS4.03 (15th ed. 2010).

**4.** Chapter 7 is described as "straight" bankruptcy or "liquidation," as follows:

It requires an individual to give up property which is not "exempt" under the law, so the property can be sold to pay creditors. Generally, those who file chapter 7 keep all of their property except property which is very valuable or which is subject to a lien which they can not avoid or afford to pay.

13 *Collier on Bankruptcy* § CS4.03 (15th ed. 2010).

the bankruptcy schedules in her chapter 7 case, she listed Ford as a creditor and the vehicle she financed through Ford (the "Vehicle") as an asset. She did not reaffirm the Vehicle during her chapter 7 bankruptcy case. There appears to be no dispute that at all times before, during and after Ms. Roberson's chapter 7 bankruptcy case, she timely made all monthly payments on the Vehicle to Ford and the Vehicle was, at all times, properly insured and titled.

Ms. Roberson had entered into a "Maryland Simple Interest Vehicle Retail Installment Contract," containing an *ipso facto* clause,[5] in which, among other contingencies, the filing of a bankruptcy petition was characterized as a default:

> To consummate the purchase and finance of the Vehicle, Ms. Roberson and Ford executed a Maryland Simple Interest Vehicle Retail Installment Contract (the "Vehicle Contract") dated on or about July 11, 2004. The Vehicle Contract contains an *ipso facto* clause as follows:
>
> F.   **Default:** You will be in default if:
>
> &ast;      &ast;      &ast;
>
> 4.   You file a bankruptcy petition or one is filed against you.
>
> &ast;      &ast;      &ast;
>
> If you do not cure a default where allowed by law, the Creditor may require you to pay at once the unpaid Amount Financed, the earned and unpaid part of the Finance Charge and all other amounts due under this contract. He may repossess (take back) the vehicle, too. He may also take goods found in the vehicle when repossessed and hold them for you.

Vehicle Contract at page 2.

After Ms. Roberson's Chapter 7 bankruptcy case was closed, Ford Motor Credit repossessed the car because Ms. Roberson failed to cure the default by executing a reaffirmation agreement. Ms. Roberson, thereafter, filed a Chapter 13

---

**5.**   "Ipso facto" means "by the fact itself" or "[b]y the very nature of the situation[.]"   Black's Law Dictionary 905 (9th ed. 2009).

bankruptcy petition, the sole basis for which was to "facilitate recovery" of the car and to seek damages from Ford Motor Credit for "wrongfully, illegally and maliciously" repossessing the car:

On February 19, 2008, about three weeks after Ms. Roberson received her chapter 7 discharge, Ford repossessed Ms. Roberson's Vehicle on the basis that she had breached the *ipso facto* clause in the Vehicle Contract by virtue of having filed for bankruptcy protection.

Two days after the repossession of the Vehicle, on February 21, 2008, Ms. Roberson filed the instant chapter 13 case. Ms. Roberson alleges that her sole motivation in filing this case is to redress her rights *vis a vis* Ford and to attempt to obtain her Vehicle from Ford based on what she asserts was a wrongful taking under Maryland law. Although Ms. Roberson initially filed an Emergency Motion for Return of Vehicle in her main bankruptcy case, she later filed an adversary complaint against Ford.

Ford argues that its repossession of Ms. Roberson's Vehicle was lawful because Ms. Roberson filed a bankruptcy petition and failed to take steps in her previous chapter 7 case to reaffirm the debt owing to Ford. Accordingly, Ford claims, under Maryland state law and the Vehicle Contract, Ford was permitted to repossess Ms. Roberson's vehicle based on the *ipso facto* clause, *i.e.*, based on nothing more than the fact that Ms. Roberson filed for bankruptcy protection.

There appears to be no dispute that at all relevant times, Ms. Roberson was current on her payments to Ford, was current on her insurance obligations under the Vehicle Contract and had not breached her contract with Ford in any way, other than having filed a bankruptcy petition. Based on this breach alone, and based on its interpretation of Maryland law, Ford repossessed Ms. Roberson's car after the dismissal of her first bankruptcy case and before she filed her second bankruptcy case.

Now, in the context of her second bankruptcy case, Ms. Roberson is attempting to redress the allegedly wrongful

repossession of her vehicle by Ford. Ford is defending based on its interpretation of Maryland law and the *ipso facto* clause in the governing contract.

Ms. Roberson alleged that the repossession was in violation of the "Discharge Injunction" [6] in her Chapter 7 case, the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (2006), the Maryland Consumer Protection Act, Sections 13–101 *et seq.* of the Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.), the Maryland Consumer Debt Collection Act, Sections 14–201 *et seq.* of the Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.), was a breach of contract, and also formed the basis for trespass and conversion actions. She also filed an "Emergency Motion for Return of Vehicle," as well. Ford Motor Credit returned the car to Ms. Roberson after, according to the creditor, she had provided "adequate protection." [7]

The action for damages is the crucible for the certified question. During the proceedings, Ford Motor Credit filed a

---

**6.** 11 U.S.C. § 524(a) (2006), governing the effect of discharge, states: A discharge in a case under this title—

    *       *       *

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; and

(3) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case, on account of any allowable community claim, except a community claim that is excepted from discharge under section 523, 1228(a)(1), or 1328(a)(1), or that would be so excepted, determined in accordance with the provisions of sections 523(c) and 523(d) of this title, in a case concerning the debtor's spouse commenced on the date of the filing of the petition in the case concerning the debtor, whether or not discharge of the debt based on such community claim is waived.

**7.** Thereafter, in March 2010, Ms. Roberson paid the entirety of the amount due under the installment contract and Ford Motor Credit released its security interest.

motion for summary judgment, asserting that it did not violate the discharge injunction as a matter of fact or law, was not a "debt collector" as that term is used in the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (2006) and that the Bankruptcy Court lacked "subject matter jurisdiction over the [remaining] state law allegations." Before the Bankruptcy Court ruled on the motion for summary judgment, Ms. Roberson filed a motion seeking certification of the instant question, which the Bankruptcy Court granted.

■ The crux of the certified question is whether a secured creditor is permitted under Maryland law to repossess a car in which it maintains a security interest when the debtor has filed a bankruptcy petition and has failed to reaffirm the indebtedness, but has otherwise made timely payments before, during, and after bankruptcy proceedings. To address the question in order to establish its context, we review the choices available to a debtor who seeks to keep her car which is encumbered by a loan, when the debtor opts for discharge as a Chapter 7 bankrupt.

When a buyer finances the purchase of a car with funds advanced by a creditor, the creditor often retains a security interest in the car as collateral. *See* Section 12–1021 of the Commercial Law Article, Maryland Code (1975, 2005 Repl. Vol.) (stating that if the "consumer borrower is in default," the "credit grantor may repossess tangible personal property securing the loan"). The creditor, in turn, may also define what constitutes a default under the loan, and Ford Motor Credit defined default in the vehicle retail installment contract in the present case as follows:

F. **Default:** You will be in default if:

1. You do not make any payment when it is due; or

2. You gave false or misleading information on your credit application relating to this contract; or

3. Your vehicle is seized by any local, state, or federal authority and is not promptly and unconditionally returned to you; or

4. You file a bankruptcy petition or one is filed against you; or

5. You do not keep any other promise in this contract.

If you do not cure a default where allowed by law, the Creditor may require you to pay at once the unpaid Amount Financed, the earned and unpaid part of the Finance Charge and all other amounts due under this contract. He may repossess (take back) the vehicle, too. He may also take goods found in the vehicle when repossessed and hold them for you.

Once the debtor files a Chapter 7 bankruptcy petition, the protection of the automatic stay is triggered, 11 U.S.C. § 362, which "operates as a stay against lawsuits and lien enforcement[.]" Richard B. Levin, *Fundamentals of Bankruptcy Law* 175 (7th ed. 2010).

At this juncture, the debtor has two options: either "reaffirm" the debt by assuming personal liability for the loan or redeem the car by paying the entire balance due on the note. 11 U.S.C. § 521(a)(2), (a)(6) (2006). Because a debtor is not legally obligated to repay a discharged debt, a creditor whose debt is secured by collateral, such as a car, may insist that the debt be reaffirmed. 13A *Collier on Bankruptcy* § CS20.11 (15th ed. 2010).

In the present case, Ford Motor Credit tendered a reaffirmation agreement to Ms. Roberson after her Chapter 7 bankruptcy filing, which, although not relevant to the question before us, would have formed the basis for a new contract between Ford Motor Credit and Ms. Roberson. The Bankruptcy Court would have also had to ratify the agreement for it to be valid. 13A *Collier on Bankruptcy* at § CS20.11 [2]-[3]. Ms. Roberson, however, refused to execute a reaffirmation agreement, instead stating that she intended to "retain" the car and "pay pursuant to original contract."

Ford Motor Credit argues that because Ms. Roberson neither reaffirmed the debt nor paid off the remainder of the loan, it was permitted to repossess the car by Section 12–1023(b) of the Credit Grantor Closed End Credit Provisions

("CLEC"), Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.), which Ford Motor Credit elected to govern the retail installment contract, pursuant to Section 12–1013.1 of CLEC.[8] Ms. Roberson counters that the bankruptcy clause default provision in the contract is prohibited by Maryland law, specifically Section 12–1023 of CLEC, as well as any other potential governing statutes, those being Section 12–607 of the Retail Installment Sales Act ("RISA"), Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.) and Section 12–923 of the Credit Grantor Revolving Credit Provisions ("OPEC"), Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.).[9]

The relevant statutory provisions are as follows:

Section 12–1023(b) of CLEC states, in pertinent part:

(2) An agreement, note, or other evidence of a loan may not contain:

\*　　\*　　\*

(ii) An acceleration clause under which any part or all of the unpaid balance of the loan not yet matured may be declared

---

8. Section 12–1013.1 of the Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.), governs an election by the creditor, as follows:
   (a) *Option to make loan.*—(1) On or after October 1, 1993, a credit grantor may at its option elect to make a loan to any borrower either pursuant to this subtitle or as otherwise permitted by applicable law. (2) In order to make a loan under this subtitle, a credit grantor shall make a written election to that effect in the agreement, note, or other evidence of the loan.
   (b) *Applicability of other subtitles.*—(1) If a credit grantor elects in accordance with this section to make a loan under this subtitle, the provisions of Subtitle 1, 3, 4, 5, 6, or 9 of this title do not apply to the loan.
   (2) If a person fails to elect in accordance with this section to extend closed end credit under this subtitle, the provisions of this subtitle do not apply.

9. All references to Section 12–607 of the Retail Installment Sales Act ("RISA"), Section 12–923 of the Credit Grantor Revolving Credit Provisions ("OPEC"), and Section 12–1023 of the Credit Grantor Closed End Credit Provisions ("CLEC"), throughout are to the current iterations in the Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.), unless otherwise noted.

due and payable because the credit grantor deems itself insecure[.]

Section 12–923(b) of OPEC states, in pertinent part:

(2) An agreement governing a revolving credit plan or any instrument which evidences or secures an extension of credit under the plan may not contain:

\*     \*     \*

(ii) An acceleration clause under which any part or all of the unpaid balance of any extension of credit not yet matured may be declared due and payable because the credit grantor deems itself insecure[.]

Section 12–607(a) of RISA states, in pertinent part:

(a) *Provisions prohibited.*—A holder may not take or receive any instrument from a buyer or a surety for a buyer, which contains:

\*     \*     \*

(4) A provision for the repossession of the goods or for the acceleration of the time when any part or all of the time balance becomes payable, if the condition of the repossession or acceleration is that the holder considers himself insecure[.]

Sections 12–1023 of CLEC, 12–923 of OPEC, and 12–607 of RISA, all prohibit the creditor from taking certain actions if it considers itself "insecure." The term "insecure" is not expressly defined in the Commercial Law Article, although a number of its provisions recognize "insecurity" as a condition which gives rise to the need for a debtor or another who is expected to give assurance to the creditor or one needing assurance that performance of a contract will occur.[10] For

---

**10.** "Insecure" is defined as "[h]aving a good-faith belief that the possibility of receiving payment or performance from another party to a contract is unlikely." Black's Law Dictionary 866 (9th ed. 2009). Section 1–208 of the Commercial Law Article, Maryland Code (1975, 2002 Repl.Vol.), states that, "A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral 'at will' or 'when he deems himself insecure' or in words of similar import shall be construed to mean that

example, Section 2–210 of the Commercial Law Article, Maryland Code (1975, 2002 Repl.Vol.), governing sales, provides, in relevant part:

(6) The other party may treat any assignment which delegates performance as creating reasonable grounds for insecurity and may without prejudice to his rights against the assignor demand assurances from the assignee.

Section 2–609 of the Commercial Law Article, Maryland Code (1975, 2002 Repl.Vol.), also provides that, "A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return." Finally, Section 2A–401 of the Commercial Law Article, Maryland Code (1975, 2002 Repl.Vol.), involving leases, also integrates the term "insecurity," as follows:

(2) If reasonable grounds for insecurity arise with respect to the performance of either party, the insecure party may demand in writing adequate assurance of due performance. Until the insecure party receives that assurance, if commercially reasonable, the insecure party may suspend any performance for which he (or she) has not already received the agreed return.

Other Commercial Law provisions incorporating the term include Section 22–504(c) of the Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.), which states that, "A party to the original contract, other than the transferor, may treat a transfer that conveys a right or duty of performance without its consent as creating reasonable grounds for insecurity and, without prejudice to the party's rights against the

---

he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired." *See also* Section 2A–109 of the Commercial Law Article, Maryland Code (1975, 2002 Repl.Vol.).

transferor, may demand assurances from the transferee under § 22–708 of this title," and Section 22–708(a) of the Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.), which provides that, "A contract imposes an obligation on each party not to impair the other's expectation of receiving due performance. If reasonable grounds for insecurity arise with respect to the performance of either party, the aggrieved party may ... [d]emand in a record adequate assurance of due performance[.]" [11]

With this sense of what the term "insecure" or "insecurity" means and the breadth of its inclusion in the Commercial Law Article, we turn to the statutory sections in issue. RISA, the oldest of the three statutory schemes, was enacted by Chapter 851 of the Maryland Laws of 1941 to address abuses in retail installment contracts, as follows:

This legislation reflects the view that "improvident and careless consumers who buy on the installment plan need legal protection" (Report of Committee on Consumers Credit, Massachusetts, 1936), and that without such protection "in the usual case the buyer probably is discouraged from reading the contract and might not fully understand its terms even if he did read it." This legislation aims to eliminate "contract abuses" by requiring the contract to be in writing, to be delivered to the purchaser within a definite period, to contain certain information and not to contain certain provisions. Research Report No. 6. Thus, the Maryland act aims not only to prevent actual frauds (*Cooke v. Real Estate Trust Co.*, 180 Md. 133, 139, 22 A.2d 554), but to close avenues to fraud.

*Stride v. Martin*, 184 Md. 446, 451–52, 41 A.2d 489, 491–92 (1945). Section 12–607 of RISA, the specific provision, was also enacted by Chapter 851 of the Laws of 1941, and stated:

---

11. In *Rad Concepts, Inc. v. Wilks Precision Instrument, Co.*, 167 Md. App. 132, 168, 891 A.2d 1148, 1170 (2006), for example, the Court of Special Appeals affirmed the Circuit Court's finding that a manufacturer of x-ray cassette holders had reasonable grounds for insecurity pursuant to Section 2–609 of the Commercial Law Article, Maryland Code (1975, 2002 Repl.Vol.), because of the corporation's payment history and avoidance of telephone calls.

113. *Provisions Forbidden in Instruments.* No seller, sales finance company, or holder shall at any time take or receive any instrument from a buyer, or from any surety or guarantor for the buyer, which contains:

\*     \*     \*

(d) *any provision for repossession of the goods or for the acceleration of the time when any part or all of the time balance becomes payable,* if the condition of such repossession or acceleration is in substance that the seller or holder deems himself to be insecure[.]

(emphasis added). The Section was repealed and reenacted as Section 12–607 of the Commercial Law Article by Chapter 49 of the Maryland Laws of 1975, but otherwise remained substantively unchanged.

Section 12–1023 of CLEC and Section 12–923 of OPEC have more circuitous origins. As we described in *Biggus v. Ford Motor Credit Co.,* 328 Md. 188, 613 A.2d 986 (1992), CLEC and OPEC were enacted as the "Credit Deregulation Act" by Chapter 143 of the Laws of 1983, to entice creditors to do business in the State:

Prior to the 1983 session of the General Assembly, four Maryland banks transferred certain of their operations to Delaware where the banking laws were more favorable. These included the credit card operations of two major banks based in Baltimore. Some 1,000 jobs were lost in the Baltimore area. The response by the General Assembly was Chapter 143 of the Acts of 1983, the enactment of which was urged by then Mayor Schaefer of Baltimore and others. Chapter 143 has become known as the Credit Deregulation Act of 1983.

*Id.* at 197, 613 A.2d at 991. Both CLEC and OPEC enable a creditor to unilaterally elect the legal framework for structuring a form contract to be offered to potential borrowers.[12]

---

12. Section 12–1014(a) of CLEC, Commercial Law Article, Maryland Code (1975, 1983 Repl.Vol.), stated: "Notwithstanding any other provisions of this title, a credit grantor may at its option elect to make a loan

Section 12–1023 of CLEC and Section 12–923 of OPEC were added to their respective subtitles by Chapter 404 of the Maryland Laws of 1993. Section 12–1023 of CLEC states, in pertinent part:

(a) This section applies only to a loan made by a credit grantor under this subtitle to a consumer borrower.

(b)(1) Paragraph (2) of this subsection applies only to a loan or an extension of credit primarily for personal, household, or family purposes.

(2) An agreement, note, or other evidence of a loan may not contain:

\*     \*     \*

(ii) An acceleration clause under which any part or all of the unpaid balance of the loan not yet matured may be declared due and payable because the credit grantor deems itself insecure.

1993 Maryland Laws, Chapter 404. A nearly identical provision was added to Section 12–923 of OPEC, as follows:

(a) This section applies only to a plan established by a credit grantor under this subtitle for a consumer borrower.

(b)(1) Paragraph (2) of this subsection applies only to a loan or an extension of credit primarily for personal, household, or family purposes.

(2) An agreement governing a revolving credit plan or any instrument which evidences or secures an extension of credit under the plan may not contain:

\*     \*     \*

(ii) An acceleration clause under which any part or all of the unpaid balance of any extension of credit not yet matured

---

to any borrower either pursuant to this subtitle or as otherwise permitted by applicable law." Section 12–914(a) of OPEC, Commercial Law Article, Maryland Code (1975, 1983 Repl.Vol.), provided nearly identical language: "Notwithstanding any other provisions of this title, a credit grantor may at its option offer a plan to any borrower either pursuant to this subtitle or as otherwise permitted by applicable law."

may be declared due and payable because the credit grantor deems itself insecure[.]

1993 Maryland Laws, Chapter 404.

Ms. Roberson interprets these provisions as having prohibited Ford Motor Credit from repossessing her car based solely on her Chapter 7 bankruptcy filing. Ford Motor Credit counters that Section 12–1023 of CLEC prohibits only acceleration in the face of creditor insecurity, and therefore permits repossession when a debtor files bankruptcy.

In addressing this conundrum, our decision in *Biggus,* 328 Md. at 188, 613 A.2d at 986, is informative, largely because of the Legislature's reaction to that opinion. In *Biggus,* we were asked to consider the interrelationship of RISA and CLEC. In that case, Mr. Biggus had purchased a used Ford van, entering into a "Maryland Retail Installment Contract," which included the grant of a security interest in the vehicle to the creditor, and the following:

**G. General:** Any change in this contract must be in writing and signed by you and the Creditor. The law of Maryland applies to this contract including Subtitle 10 of the Maryland Commercial Law Article. If the applicable law does not allow all of the agreements in this contract, the ones that are not allowed will be void. The rest of this contract will still be good.

*Id.* at 191–92, 613 A.2d at 988. When he failed to make two consecutive scheduled payments, the van was repossessed and sold at a public auction. Ford then filed suit against Mr. Biggus in the District Court to collect a deficiency of $2,248.92, and Mr. Biggus responded by alleging that Ford had not complied with the repossession provisions of RISA, such that he was absolved from any deficiency liability. The District Court agreed with Mr. Biggus, but the Circuit Court reversed, holding that CLEC rather than RISA applied and entered judgment in favor of Ford Credit. We affirmed the Circuit Court, reasoning that the contract elected CLEC both "by express election and also by structuring the document consistently with CLEC," such that the disclosure and storage

of vehicle provisions of RISA were not applicable. *Id.* at 202, 613 A.2d at 994. In so holding, we reasoned that "[t]he repossession systems of RISA and CLEC are respectively complete in themselves, in the sense that each is intended to be applied independently of the other." *Id.* at 208, 613 A.2d at 996. We also addressed, in dicta, the question of whether CLEC was intended to apply exclusively to all aspects of a transaction for which CLEC had been elected, even if CLEC was silent on, but RISA spoke about, the issue. We opined that where CLEC was silent, the provisions of RISA could apply:

> Implicit in [the consumer's] argument that an effective election of CLEC is "mutually exclusive" of RISA is the concept that CLEC then becomes the only body of Maryland law that bears on any aspect of the transaction. That is correct as to any aspect, such as interest, disclosure, or repossession, as to which the Legislature manifested an intent that CLEC have that effect. But there are subjects regulated by RISA, by other Maryland statutes, and by common law, that are not addressed at all by CLEC. In other words, an election to extend credit under CLEC does not make RISA, or other Maryland law, entirely irrelevant to the credit transaction.

*Id.* at 208, 613 A.2d at 996.

In reaction to *Biggus,* the General Assembly enacted Chapter 404 of the Maryland Laws of 1993, containing Section 12–1023 of CLEC and Section 12–923 of OPEC:

> The *Biggus* case means that a credit grantor who elects to operate under [OPEC or CLEC] is only assured protection from other competing credit statutes in the following areas:
>
> (1) Interest fees, points, disclosure, and other items listed under the exclusionary clauses;
>
> (2) Other aspects of a credit transaction which [OPEC or CLEC] regulates in a manner sufficiently comprehensive as to completely occupy the field.

House Economic Matters Committee Bill Analysis on HB 424, at 9–10 (1993). It appears that the Legislature was concerned that lenders would cease undertaking new loans:

> Many lenders currently package loans made under [OPEC or CLEC] and sell them on the secondary market. Any impairment of value of these loans would jeopardize the ability of the lenders to market these loans. Because the lenders rely on the income from the sale of loan packages to finance new lending, the lack of marketability of loans made in Maryland may cause lenders to cease making new loans because they lack the capital to do so.

> The *Biggus* case implied the existence of causes of action on the part of borrowers arising under the "old law" [RISA] in those areas where [OPEC or CLEC] is silent as to a particular regulatory function. The potential liability arising from the loan portfolios of banks or other financial institutions who have made or purchased loans made over the last ten years under [OPEC or CLEC], could require them to set aside special "loan loss reserves" and consequently decreasing their capital base. In addition, because the *Biggus* case did not identify all of the possible areas of the "old law" [RISA] that may be read into [OPEC or CLEC], it is likely that it will give rise to a substantial amount of litigation intended to explore the full parameters of the case.

House Economic Matters Committee Bill Analysis on HB 424, at 10.[13]

---

13.  The bill file contains a chart entitled "Comparison of Relevant Credit Provisions" that compares the "prohibited provisions" in RISA and CLEC and indicates that RISA precludes both repossession and acceleration "if lender feels insecure," while OPEC and CLEC prohibit only "balloon payment[s]." *See* Comparison of Relevant Credit Provisions, HB 424 (on file with Department of Legislative Services).

The bill file also contains a press release dated February 18, 1993, that demonstrates that the legislation was designed to overrule *Biggus*, insofar as *Biggus* suggested that areas of RISA may be read into OPEC or CLEC, as follows:

> The effect of the proposed legislation is to clarify that, for any extension of credit made prior to October 1, 1993, so long as a

■ The language of Section 12–607(a)(4) of RISA prohibiting both "repossession" and "acceleration" if "the holder considers himself insecure" then, is certainly distinct from the language of Section 12–1023(b)(2)(ii) of CLEC prohibiting only "acceleration" if the creditor "deems itself insecure." Thus, the language of CLEC does not prohibit repossession in the event of insecurity. CLEC clearly is intended to be construed independently from RISA. Moreover, the Legislature is "presumed to act with full knowledge of existing laws," so that if the General Assembly sought to safeguard debtors by prohibiting both "repossession" and "acceleration" on the basis of creditor insecurity in CLEC (and OPEC), as it did in RISA, it could and would have so done. *See Proctor v. Washington Metropolitan Area Transit Authority,* 412 Md. 691, 720, 990 A.2d 1048, 1065 (2010), quoting *Collier v. Nesbitt,* 79 Md.App. 729, 733–34, 558 A.2d 1242, 1244 (1989); *see also Burch v. United Cable Television of Baltimore Ltd. P'ship,* 391 Md. 687, 702, 895 A.2d 980, 988 (2006) ("We presume that the General Assembly had, and acted with respect to, full knowledge and information as to prior and existing law . . . and the policy of the prior law." (quoting *Maryland Div. of Labor and Indus. v. Triangle,* 366 Md. 407, 422, 784 A.2d 534, 542 (2001))).

■ Ms. Roberson's reference to *Ford v. GMAC,* 98 Md. App. 257, 633 A.2d 410 (1993), in which our colleagues on the intermediate appellate court considered whether a creditor

---

credit grantor has specifically elected to be under [OPEC or CLEC] or can be construed to have extended credit under [OPEC or CLEC] (where there was no specific election), [OPEC or CLEC] is the controlling law governing the extension of credit and provisions of other law may not be read into the loan agreement. This exclusivity will also apply to extensions of credit made under [OPEC or CLEC] after October 1, 1993, provided that the credit grantor has made a valid written election. This will provide a great deal of security to Maryland lenders by protecting their current loan portfolios from lawsuits and reassuring lenders that when they make loans under certain portions of Maryland law they know exactly what provisions of law apply.
Press Release, Feb. 18, 1993, House Bill 424 (on file with Department of Legislative Services).

had appropriately repossessed a vehicle pursuant to RISA when the car was seized by police, is inapposite because the General Assembly intended that RISA and CLEC operate independently. *See* Summary by staff member Lars Kristiansen, Revolving and Closed End Credit—Applicability of Other Laws, at 1 (on file with the Department of Legislative Services) ("The bill states that any extension of credit made under subtitles 9 and 10 will be governed exclusively by these subtitles and not by any other subtitle of Title 12 of the Commercial Law Article.").[14]

---

14. In a related argument, Ms. Roberson asserts that pursuant to Section 12–1021(h) of CLEC, a debtor in default of payment may redeem a car that the creditor has repossessed simply by tendering "the amount due under the agreement at the time of redemption, without giving effect to any provision which allows acceleration." The fact that Ms. Roberson would have been in a better position had she defaulted monetarily, namely tendering the amount past due, does not change our analysis.

A coalition of amicus curiae comprised of Civil Justice, Inc., the Maryland Cash Campaign, the Public Justice Center, the Maryland Legal Aid Bureau, Inc., and the University of Maryland School of Law Consumer Protection Clinic, refers us to an unpublished opinion of a Pennsylvania trial court, *Malachin v. Daimler Chrysler Financial Services*, 2007 Pa. Dist. & Cnty. Dec. LEXIS 158 (2007), in which the creditor repossessed a car when a debtor filed bankruptcy and failed to reaffirm the debt. The court interpreted a statute prohibiting "acceleration" when a creditor "deems himself to be insecure," as follows:

> No installment sale contract shall contain any acceleration clause under which any part or all of the time balance represented by payments, not yet matured, may be declared immediately payable because the seller or holder deems himself to be insecure.

The court determined that "[t]here having been no default except the filing of the bankruptcy petition, Defendant was not entitled to repossess the vehicle." *Id.* at *2. *Malachin* is distinguishable, however, because the trial court was not presented with parallel statutory schemes, in which one prohibited both "acceleration" and "repossession" and the other prohibited only "acceleration" in the face of insecurity. Because we presume that the Legislature acted with full knowledge of existing law, namely RISA Section 12–607(a)'s language of "repossession" and "acceleration," *Malachin* is not persuasive.

The amici also assert that Chapter 404 of the Maryland Laws of 1993 was opposed by some creditors, as evidenced by a letter from Charles W. Turnbaugh, Senior Vice President and General Counsel of Loyola Federal Savings Bank, asserting that "the severe penalties imposed for any failure to comply with Subtitles 9 and 10 of Title 12 ... could clearly cost Loyola and other lenders." Although lenders may have

Further, were we to preclude a creditor from repossessing a car under Section 12–923 of OPEC or 12–1023 of CLEC when the debtor has filed a bankruptcy petition and has failed to reaffirm the indebtedness, thereby causing the creditor to be "insecure," we would implicitly be asserting that repayment default is the only basis for insecurity which could impinge negatively on the consequences of insecurity in the various Commercial Law Article provisions.[15]

█ As a result, because the parties agree that Ford Motor Credit elected CLEC to govern the retail installment contract in the present case, the answer to the certified question concerning whether, under Maryland law, a creditor may repossess a car when a debtor has filed bankruptcy and has failed to reaffirm the indebtedness, is "yes" under CLEC. Section 12–1023(b) of CLEC and Section 12–923(b) of OPEC clearly prohibit only "acceleration" in the face of creditor insecurity, as evidenced by the plain meaning and corroborated by the legislative history of those provisions, while Section 12–607(a) of RISA prohibits both "repossession" and "acceleration" when a creditor deems itself "insecure."

**CERTIFIED QUESTION ANSWERED AS SET FORTH ABOVE. PURSUANT TO SECTION 12–610 OF THE COURTS AND JUDICIAL PROCEEDINGS ARTICLE, THE COSTS SHALL BE EQUALLY DIVIDED BETWEEN THE PARTIES.**

---

viewed the amendments to OPEC and CLEC unfavorably, there is no specific reference in the letter to the prohibition against "acceleration" on the grounds of insecurity in Section 12–1023 of CLEC or 12–923 of OPEC as potentially also preventing creditors from repossessing in the face of insecurity.

**15.** In a related vein, the amici refer us to *In re Visnicky*, 401 B.R. 61 (Bankr.R.I.2009), *In re Steinhaus*, 349 B.R. 694 (Bankr.Idaho 2006), and *In re Rowe*, 342 B.R. 341 (Bankr.Kan.2006), as support for the proposition that in those jurisdictions that ascribe to the Uniform Consumer Credit Code, the filing of a bankruptcy petition has not been interpreted as constituting a "significant impairment" of payment or performance. These cases are inapposite, however, because our statutory scheme considers only a creditor's insecurity rather than the notion of "significant impairment."