**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 14-1384**

_____

DANTE ASKEW, on his own behalf and on behalf of all others similarly situated,

            Plaintiff - Appellant,

    v.

HRFC, LLC, d/b/a Hampton Roads Finance Company,

            Defendant - Appellee.

_____

Appeal from the United States District Court for the District of Maryland, at Baltimore.   Richard D. Bennett, District Judge. (1:12-cv-03466-RDB)

_____

Argued:  September 15, 2015        Decided:  January 11, 2016

_____

Before WYNN and DIAZ, Circuit Judges, and DAVIS, Senior Circuit Judge.

_____

Affirmed in part, reversed in part, and remanded by published opinion.  Judge Diaz wrote the opinion, in which Judge Wynn and Senior Judge Davis joined.

_____

Cory Lev Zajdel, Z LAW, LLC, Reisterstown, Maryland, for Appellant.  Kelly Marie Lippincott, CARR MALONEY P.C., Washington, D.C., for Appellee.

_____

DIAZ, Circuit Judge:

Dante Askew appeals the district court's grant of summary judgment to Hampton Roads Finance Company ("HRFC"). Askew contends that the court erred in holding that HRFC was not liable for (1) violating the Maryland Credit Grantor Closed End Credit Provisions ("CLEC"), Md. Code Ann., Com. Law § 12-1001 et seq., (2) breach of contract, and (3) violating the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code. Ann., Com. Law § 14-201 et seq. For the reasons that follow, we affirm the district court's judgment with regard to Askew's CLEC and breach of contract claims. As for Askew's MCDCA claim, however, we reverse the district court's order granting summary judgment to HRFC and remand for further proceedings consistent with this opinion.

I.

A.

This case arises out of a 2008 retail installment sales contract between Dante Askew and a car dealership financing the purchase of a used car. The dealership subsequently assigned the contract to HRFC.

The contract, which is subject to CLEC, charged a 26.99% interest rate, exceeding CLEC's maximum allowable rate of 24%. § 12-1003(a). In August 2010, HRFC recognized this discrepancy.

2

The following month, it sent Askew a letter informing him that "the interest rate applied to [his] contract was not correct" and that HRFC had credited his account $845.40. J.A. 228. The letter also said that HRFC "w[ould] continue to compute interest at the new rate [of 23.99%] until [Askew] make[s] [his] final payment."[1] J.A. 228. Finally, HRFC told Askew that he would repay his loan earlier if he continued to make the same monthly payments, but that HRFC would "adjust [his] monthly payments so that the contract will be repaid on the date originally scheduled" if he so requested. J.A. 228. The parties do not dispute that HRFC made all of the adjustments it claimed in its letter.

After receiving the letter, Askew fell behind on his payments, leading HRFC to take steps to collect on his account. From July 2011 to December 2012, HRFC contacted Askew five times seeking repayment—four times by letter and once by phone. Askew alleges that HRFC made a number of false and threatening statements to induce him to repay his debt, including that (1) HRFC reported him to state authorities for fraud for failing to insure his car and for concealing it from repossession agents; (2) a replevin warrant had been prepared, which increased his debt; and (3) his complaint in this case had been dismissed.

---

[1] The letter did not specify the new rate, an omission that we discuss later.

B.

Askew filed suit in state court alleging violations of CLEC and the MCDCA as well as breach of contract based on HRFC's supposed failure to comply with CLEC. HRFC removed the case to federal court.

After limited discovery related to Askew's CLEC allegations, HRFC moved for summary judgment, which the district court granted. With regard to Askew's CLEC claims, the court held that (1) Askew did not present sufficient evidence that HRFC knowingly violated CLEC under section 12-1018(b), and (2) CLEC's section 12-1020 safe-harbor provision shielded HRFC from any other basis for liability under the statute. The court also held that Askew's breach of contract claim must rise and fall with his CLEC claim. Accordingly, the court concluded that HRFC was not liable for breach of contract. As to Askew's MCDCA claim, the court held that "[t]aken individually or as a whole, HRFC's course of conduct in attempting to collect the debt owed on the [contract] by Askew did not reasonably rise to the level of abuse or harassment" necessary to constitute a violation of the statute. Askew v. HRFC, LLC, No. RDB-12-3466, 2014 WL 1235922, at *10 (D. Md. Mar. 25, 2014).

This appeal followed.

4

II.

Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmovant. Defenders of Wildlife v. N.C. Dep't of Transp., 762 F.3d 374, 392 (4th Cir. 2014). Because this case involves solely state-law matters, "our role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue." Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co., 514 F.3d 327, 329 (4th Cir. 2008).

A.

We turn first to Askew's contention that the district court erred in granting summary judgment to HRFC on his CLEC claims. We begin by sketching out CLEC's basic framework.

Credit grantors doing business in Maryland may opt to make a loan governed by CLEC if they "make a written election to that effect." § 12-1013.1. If the statute applies, section 12-1003(a) sets a maximum interest rate of 24% and mandates that "[t]he rate of interest chargeable on a loan must be expressed in the agreement as a simple interest rate or rates." Generally, if a credit grantor violates this provision, it may collect only the principal of the loan rather than "any

5

interest, costs, fees, or other charges." § 12-1018(a)(2). If a credit grantor "knowingly violates [CLEC]," it "shall forfeit to the borrower 3 times the amount of interest, fees, and charges collected in excess of that authorized by [the statute]." § 12-1018(b).

CLEC also includes two safe-harbor provisions, one of which, section 12-1020, is central to this case. Section 12-1020 affords credit grantors the opportunity to avoid liability through self-correction. It provides:

> A credit grantor is not liable for any failure to comply with [CLEC] if, within 60 days after discovering an error and prior to institution of an action under [CLEC] or the receipt of written notice from the borrower, the credit grantor notifies the borrower of the error and makes whatever adjustments are necessary to correct the error.

§ 12-1020. CLEC's second safe harbor, section 12-1018(a)(3), differs in a key respect relevant to this case: while section 12-1020 applies to "any failure to comply with [CLEC]," section 12-1018(a)(3) offers no protection from knowing violations.

Askew presents three principal arguments with respect to CLEC. First, he says that HRFC violated CLEC by failing to expressly disclose in the contract an interest rate below the statutory maximum. If he were correct on this point, HRFC would have committed an uncured violation of CLEC and therefore would be liable. Second, Askew contends that the "discovery rule" from the statute-of-limitations context should apply to the

6

section 12-1020 safe harbor, which would mean HRFC failed to cure an error within sixty days of discovery as section 12-1020 requires.[2]  Finally, Askew argues that section 12-1020 provides HRFC no protection because (1) HRFC failed to properly notify him of the interest-rate error, and (2) it failed to make the necessary adjustments to correct the error.  We discuss these contentions in turn.

1.

Askew argues that it is a distinct violation of section 12-1003(a) to fail to expressly disclose an interest rate below CLEC's maximum in the operative contract.  Here, the parties do

---

[2] Askew also argues that HRFC "knowingly" violated CLEC within the meaning of section 12-1018(b), which he asserts precludes application of section 12-1020's safe harbor.  He reasons that section 12-1018(b) "requires only a showing that the violator knows that he is engaging in the act that violates the law - evidence of a specific express knowledge that the act violates the law is not required to find a knowing violation . . . - because ignorance of the law is no excuse[.]" Appellant's Br. at 44.  According to Askew then, HRFC knew the facts constituting the violation when it accepted assignment of the contract because parties to a contract are presumed to have read and understood its terms.  That, says Askew, is enough to make out a knowing violation of the statute, even if HRFC did not immediately understand the legal significance of the contract terms.

But whether Maryland courts would hold that knowledge of the operative contract terms is alone sufficient to make out a "knowing" violation of section 12-1018(b) is a question that we do not decide.  As we explain later, section 12-1020 allows a credit grantor to cure any failure to comply with CLEC, knowing or otherwise, provided it acts within 60 days of discovering that it violated the statute and before the borrower files suit or provides notice to the credit grantor.

7

not dispute that the contract specifies an interest rate above the statutory maximum. Consequently, if Askew's interpretation of CLEC were correct, he would prevail because HRFC would have committed an uncured violation of section 12-1003(a).

Askew's argument turns on the text of section 12-1003(a), which states:

> A credit grantor may charge and collect interest on a loan . . . as the agreement, the note, or other evidence of the loan provides if the effective rate of simple interest is not in excess of 24 percent per year. The rate of interest chargeable on a loan must be expressed in the agreement as a simple interest rate or rates.

Askew urges that the word "provides" in the statute mandates that "a credit grantor is authorized to charge and collect interest . . . only after . . . the credit grantor discloses an interest rate equal to or less than 24% in the [retail installment sales contract]." Appellant's Br. at 23. Additionally, with regard to the second sentence of section 12-1003(a), Askew says that (1) the term "rate of interest chargeable" refers to a maximum of 24%, and (2) this rate must be expressly disclosed in the contract.

The district court rejected Askew's arguments, explaining that the only disclosure requirement in section 12-1003(a) is one mandating that the interest rate charged be expressed as a simple interest rate. See Askew, 2014 WL 1235922, at *5. We agree.

8

In our view, the first sentence of section 12-1003(a) bars credit grantors from collecting or charging interest above 24%, while the second sentence requires credit grantors to express the rate as a simple interest rate. Interpreted this way, the statute furthers two important purposes. First, it prevents credit grantors from charging usurious rates. Second, it protects consumers by eliminating confusion caused by difficult-to-decipher interest rates (e.g., compound interest rates) that might obscure the true cost of a loan.

Adopting Askew's interpretation, in contrast, would subject credit grantors to a rather meaningless technical requirement while doing little to help consumers. We can think of no sensible reason to interpret section 12-1003(a) so as to impose strict liability, regardless of the circumstances, whenever the paper upon which a contract is written erroneously expresses an interest rate higher than "twenty-four." Instead, read as a whole and in context, the provision targets far more immediate dangers to consumers: being charged excessive interest and being duped into accepting a deceptively high rate. Askew's concern—that a credit grantor can "disclose[] an interest rate of one thousand percent (1,000%) in the loan agreement" but then "nonetheless charge and collect interest at 24%"—strikes us as fanciful, at best. Appellant's Br. at 25. Indeed, even taking Askew's contention at face value, we suspect most consumers

9

would be pleased to pay a rate 976 percentage points lower than what they agreed to in a contract.

We hold that HRFC's mere failure to disclose an interest rate below CLEC's statutory maximum is not a distinct violation of section 12-1003(a) for which liability may be imposed.

2.

Next we consider Askew's contention that HRFC is liable under CLEC because the section 12-1020 safe harbor imports Maryland's "discovery rule" from the statute-of-limitations context. Maryland's discovery rule provides that a "cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong" that provides the basis of his claim. Poffenberger v. Risser, 431 A.2d 677, 680 (Md. 1981). It is the default rule in Maryland for when the clock begins to run on a plaintiff's cause of action. Windesheim v. Larocca, 116 A.3d 954, 962 (Md. 2015).

There is no dispute that HRFC violated section 12-1003(a) by charging Askew a 26.99% interest rate. Nevertheless, HRFC argues (and the district court agreed) that section 12-1020 shields it from liability. Essential to HRFC's contention is that it "discovered" its error—charging Askew an interest rate above CLEC's statutory maximum—in August 2010, less than sixty days before curing it. Because, says HRFC, it corrected the

10

error within section 12-1020's cure period, it cannot be held liable under CLEC.

If the discovery rule applied, however, it would move the moment of "discovery" back more than two years to the day HRFC accepted assignment of the contract. This is because HRFC should have known at the time of assignment that the contract violated section 12-1003(a), as the writing clearly (1) provides that CLEC applies, and (2) expresses an interest rate above that authorized by the statute. Thus, if we credit Askew's argument, HRFC would not have cured its error within sixty days of discovery, as required by the safe-harbor provision.

In Maryland, "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the legislature . . . begin[ning] with the plain language of the statute, and ordinary, popular understanding of the English language." Hammonds v. State, 80 A.3d 698, 709 (Md. 2013) (quoting Briggs v. State, 992 A.2d 433, 439 (Md. 2010)). "When the language of the statute is subject to more than one interpretation, it is ambiguous and [courts] usually look beyond the statutory language to the statute's legislative history, prior case law, the statutory purpose, and the statutory structure as aids in ascertaining the Legislature's intent." Id. (quoting Briggs, 992 A.2d at 439).

11

The meaning of the term "discovering" in section 12-1020 is a question of first impression. Askew attempts to fill the void in authority by citing to a number of statute-of-limitations cases holding that a statute's use of the word "discover" imports the discovery rule. Appellant's Br. at 28–32. Importantly, however, none of these cases involves a safe-harbor provision placing a deadline on a defendant.

Moreover, interpreting the term "discovering an error" in section 12-1020 to mean actually uncovering a mistake constituting a violation of the statute better comports with CLEC's text, public policy, and the statute's purpose. Analyzing the statutory language, the district court explained that the term "error" in section 12-1020 means "an 'assertion of belief that does not conform to objective reality.'" Askew, 2014 WL 1235922, at *5 (quoting Error, Black's Law Dictionary (9th ed. 2009)). The court went on to define "discovery" as the "act or process of finding or learning something that was previously unknown." Id. (quoting Discovery, Black's Law Dictionary (9th ed. 2009)). Combining these definitions, the court concluded, and we agree, that "discovery of the error means when the Defendant actually knew about" a mistake—in this case, charging an interest rate above CLEC's maximum. Id.

Equally persuasive is the negative policy implication of accepting Askew's position. If the discovery rule governed

12

CLEC's safe harbor, credit grantors would have little incentive to correct their mistakes and make debtors whole. This is particularly problematic because the borrower is unlikely to discover on his own that the interest rate charged on a loan exceeds CLEC's maximum. The instant case proves this point. Upon learning of its mistake, and but for the safe harbor, HRFC would have had little reason to inform Askew of its error, lower his interest rate, and provide a refund. Instead, HRFC might well have chosen to do nothing, leaving it to Askew to discover the error.[3] Consequently, applying the discovery rule in cases like this one is likely to exacerbate one of the harms CLEC seeks to avoid—the charging of usurious interest. On the other hand, if we reject the discovery rule, credit grantors will be encouraged to do exactly what the text of the statute encourages and what HRFC did here in fact: cure any CLEC violation upon learning of it and notify the debtor, who is otherwise unaware of any problem with the loan.

CLEC's purpose further bolsters our conclusion. The Maryland legislature enacted CLEC as part of what has become known as the "Credit Deregulation Act" in order to "entice

---

[3] We accept that the discovery rule might heighten a credit grantor's vigilance, at least for the first sixty days after accepting assignment of a contract. But, honest mistakes like the one in this case can slip through the cracks. We think the Maryland legislature intended such mistakes to be corrected upon discovery rather than swept under the rug.

13

creditors to do business in the State." Ford Motor Credit Co. v. Roberson, 25 A.3d 110, 117–18 (Md. 2011). The bill containing CLEC was introduced after "four Maryland banks transferred certain of their operations to Delaware where the banking laws were more favorable." Id. at 118 (quoting Biggus v. Ford Motor Credit Co., 613 A.2d 986, 991 (Md. 1992)). Concerned that the bill went too far in deregulating banks, however, the Maryland Attorney General objected. Patton v. Wells Fargo Fin. Md., Inc., 85 A.3d 167, 179 (Md. 2014). In a legislative compromise, the bill was amended to include some additional consumer-protection provisions. Id. at 179–80. In light of this history, CLEC is best read to handle credit grantors with a relatively light touch while still protecting consumers. Our interpretation of section 12-1020 promotes this purpose by ensuring that borrowers are made whole while allowing credit grantors to avoid litigation and penalties through self-correction.

In this case, HRFC discovered its error—the fact that it charged interest above CLEC's maximum rate—in August 2010, within sixty days of its cure attempt. Consequently, assuming HRFC properly notified Askew and "ma[de] whatever adjustments [were] necessary to correct the error," as section 12-1020 requires, the district court was correct that HRFC is not liable under CLEC. We turn now to whether that assumption is correct.

14

3.

a.

Askew contends that HRFC's September 2010 letter was so vague that it failed to meet the notice requirement of section 12-1020, which mandates that "the credit grantor notif[y] the borrower of the error." We disagree.

HRFC's cure letter provided Askew notice of the error, albeit somewhat cryptically. It identified a "problem" with Askew's interest rate and then told him that he was due a credit of $845.40. J.A. 228. Taken together, this information implies that Askew's interest rate was too high—the "error" that HRFC cured under section 12-1020. We think this was enough to comply with the statute's notice requirement.

To support his argument that HRFC needed to do more, Askew cites cases interpreting similarly worded safe-harbor provisions in the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1640(b), and a Texas usury law, Tex. Fin. Code Ann. § 305.103(a)(2). But those cases are inapposite. Both Thomka v. A. Z. Chevrolet, Inc., 619 F.2d 246, 248–52 (3d Cir. 1980), and In re Weaver, 632 F.2d 461, 462, 465–66 (5th Cir. 1980), deal with violations of disclosure provisions, unlike this case. Disclosure errors are rooted in some defect in conveying information. See, e.g., 15 U.S.C. § 1601(a) (explaining that TILA's disclosure requirements exist "so that the consumer will

15

be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit"). An anti-usury provision, on the other hand, exists to stop the collection of excessive interest. Requiring more specificity strikes us as a far more useful remedy in the former case than in the latter.

To the extent the cases dealing with the Texas statute require more specific notice than HRFC provided, they are inconsistent with CLEC's purpose, especially where the harm to the borrower—being overcharged—has been remedied. Furthermore, the Texas statute requires the creditor to give "written notice . . . of the <u>violation</u>," § 305.103(a)(2) (emphasis added), while CLEC requires notice of the "error," § 12-1020. The term "violation" is more technical, implying explicit reference to a violation of a statute. See <u>In re Kemper</u>, 263 B.R. 773, 783 (Bankr. E.D. Tex. 2001) (focusing on the term "violation" in section 305.103 in holding that "a correction of a usury violation under § 305.103 must be just that—an acknowledgment of the existence of a usury violation"). CLEC's use of the term "error," in contrast, avoids inviting jargon in the cure letter by simply requiring identification of the substance of the mistake at issue—in this case, charging too much interest.

16

We therefore conclude that HRFC complied with section 12-1020's notice requirement.

b.

Finally we address Askew's argument that HRFC failed to properly cure its error. See § 12-1020 (predicating application of the safe harbor on the credit grantor "mak[ing] whatever adjustments are necessary to correct the error"). We conclude that HRFC's cure was sufficient.

Askew first argues that HRFC never cured its failure to disclose in the contract an interest rate less than or equal to 24%. As previously discussed, this does not give rise to liability for a violation of CLEC.

Next, Askew argues that section 12-1003(a) makes charging and collecting any interest on a loan conditional on charging a rate of 24% or below. Therefore, Askew contends, HRFC should have refunded far more than $845.40, which only accounts for the amount HRFC collected in excess of CLEC's maximum rate.

We disagree. As the district court noted, "it is inconceivable that a borrower should receive such a windfall upon the credit grantor's cure of an error." Askew, 2014 WL 1235922, at *7. Furthermore, the section 12-1020 safe harbor is intended to encourage credit grantors to self-correct, which they would have little incentive to do if forced to refund all interest collected.

17

Askew also argues in his reply brief that HRFC should have refunded all interest collected in excess of 6%. Askew roots this argument in Maryland common law and the Maryland Constitution. In short, he says that "any contract assessing interest higher than the constitutional rate [of 6%] that was not otherwise controlled by a statutory provision was unlawful and the portion of interest greater than the constitutional rate w[as] recoverable in an action for usury." Reply Br. at 14; see also Md. Const. art. 3, § 57 ("The Legal Rate of Interest shall be Six per cent. per annum; unless otherwise provided by the General Assembly.").

Because Askew presents this argument too late, we need not address it. See Hunt v. Nuth, 57 F.3d 1327, 1338 (4th Cir. 1995) ("[A]ppellate courts generally will not address new arguments raised in a reply brief because it would be unfair to the appellee and would risk an improvident or ill-advised opinion on the legal issues raised."). But we note that Maryland law mandates a default rate of 6% only in the absence of a statute providing otherwise. Here, CLEC is precisely such a statute, and, for the reasons explained above, it merely required HRFC to make a timely refund of the interest it collected above CLEC's statutory maximum.

18

B.

We turn now to the question of whether the district court properly granted summary judgment to HRFC on Askew's breach of contract claim. Askew contends that because the contract incorporates CLEC's provisions, HRFC is liable for breach of contract for any deviation from CLEC, "regardless of whether HRFC properly cured the failure to comply" with the statute. Appellant's Br. at 51.

We reject this argument. Here, the contract incorporates all of CLEC—including its safe harbors. It follows that just as liability under CLEC begets a breach of the contract, a defense under CLEC precludes contract liability. A contrary outcome would nullify the effect of CLEC's safe harbors because credit grantors that properly cure mistakes—as CLEC encourages—would still face contract liability. We decline to accept such an anomalous result.

C.

We next consider whether the district court erred in granting HRFC summary judgment on Askew's MCDCA claim. Askew attacks the district court's decision on this issue on two grounds. First, he argues that a reasonable jury could conclude that he was entitled to relief. Second, he contends that the court granted summary judgment prematurely because it did not allow him discovery related to the MCDCA claim. Because a

19

reasonable jury could find that HRFC's conduct violated the MCDCA, we conclude that HRFC is not entitled to summary judgment as to this claim.

The MCDCA "protects consumers against certain threatening and underhanded methods used by debt collectors in attempting to recover on delinquent accounts." Shah v. Collecto, Inc., No. Civ.A.2004-4059, 2005 WL 2216242, at *10 (D. Md. Sept. 12, 2005) (quoting Spencer v. Hendersen-Webb, Inc., 81 F. Supp. 2d 582, 594 (D. Md. 1999)). The portion of the MCDCA at issue, section 14-202(6), provides that a debt collector may not "[c]ommunicate with the debtor or a person related to him with the frequency, at the unusual hours, or in any other manner as reasonably can be expected to abuse or harass the debtor" (emphasis added).

Askew argues that HRFC violated the MCDCA by, among other things, representing that it had taken certain legal actions against him when it had not, in fact, taken such actions. Specifically, Askew contends that HRFC (1) falsely suggested that it had obtained a replevin warrant, (2) falsely represented that "[n]otice of complaint has been forwarded to the MVA [(presumably the Maryland Motor Vehicle Administration)] fraud division for your refusal to insure the vehicle and for hiding the car from the lien holder," and (3) falsely represented that the instant case had been dismissed when it was still pending. J.A. 13–14, 280–81.

20

A jury could find that attempting to collect a debt by falsely claiming that legal actions have been taken against a debtor violates section 14-202(6).  In Zervos v. Ocwen Loan Servicing, LLC, for example, the court allowed a claim under 14-202(6) to survive a motion to dismiss based on the "Defendant's alleged representations that Plaintiffs' home had been foreclosed upon and that a sale date had been scheduled, when in fact there was no such foreclosure."  No. 1:11-cv-03757, 2012 WL 1107689, at *3, *6 (D. Md. Mar. 29, 2012).  Similarly, in Baker v. Allstate Financial Services, Inc.—a case arising under an analogous provision in the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692d[4]—a plaintiff's claim that a debt collector falsely implied that a legal case was pending against him survived a motion to dismiss.  554 F. Supp. 2d 945, 950-51 (D. Minn. 2008).

Other cases suggest that there is a line between truthful or future threats of appropriate legal action, which would not

---

[4] Section 1692d prohibits a debt collector from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt."  As HRFC notes, section 1692d "is substantively very similar to the prohibitions of [section] 14-202(6)."  Appellee's Br. at 27; see also Zervos, 2012 WL 1107689, at *6 (explaining that because the plaintiff's "allegations made out a minimally plausible claim that Defendant's communications with them regarding their mortgage were abusive or harassing under the FDCPA," her MCDCA claim under section 14-202(6) "will stand for the same reasons").

give rise to liability, and false representations that legal action has already been taken against a debtor, as HRFC allegedly made here. In Dorsey v. Morgan, for instance, the plaintiff argued that the defendant violated section 1692d by threatening future legal action against him when, according to the plaintiff, the defendant would not take such action. 760 F. Supp. 509, 515 (D. Md. 1991). The court rejected this argument, reasoning that the debt collector's supposed threat "w[as] not false" because the collector said merely that he "may request" that legal action be taken against the debtor. Id. at 515–16 (emphasis added). Similarly, in Russell v. Standard Federal Bank, the court concluded that a notice stating that a debt collector was proceeding with a foreclosure action did not violate section 1692d because it "was truthful." No. 02-70054, 2002 WL 1480808, at *5 (E.D. Mich. June 19, 2002); see also Pearce v. Rapid Check Collection, Inc., 738 F. Supp. 334, 338–39 (D.S.D. 1990) ("In this case, the only threats which defendants made were ones which legally could be taken, and in fact were taken. There has been no violation of section 1692d.").

Here, HRFC told Askew on at least three occasions that it had taken some legal action against him when (according to Askew) it had not. Contrary to what the district court held, a jury could find that this conduct, at least in the aggregate, could reasonably be expected to abuse or harass Askew.

22

Accordingly, we reverse the district court's order granting summary judgment to HRFC on Askew's MCDCA claim.

III.

For the reasons given, we affirm the judgment of the district court with respect to Askew's CLEC and breach of contract claims. With regard to Askew's MCDCA claim, however, we reverse the district court's order granting summary judgment to HRFC and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART,
REVERSED IN PART,
AND REMANDED
